# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-3497

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Western |
| | * | District of Arkansas. |
| Jeffrey William Paul, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: December 13, 1999

Filed: June 27, 2000

_____

Before BEAM, HEANEY AND HANSEN, Circuit Judges.

_____

BEAM, Circuit Judge.

In this direct criminal appeal, Jeffrey William Paul seeks reversal of his conviction for aiding and abetting murder under 18 U.S.C. §§ 2 and 1111(a); and for the knowing use of a firearm during a crime of violence under 18 U.S.C. § 924. He also appeals his death sentence under the Federal Death Penalty Act (FDPA), codified at 18 U.S.C. §§ 3591 et seq. We affirm.

## I.    BACKGROUND

Paul was convicted of aiding and abetting the murder of Sherman Williams on federal land, Hot Springs National Park. The evidence adduced at Paul's trial established that on June 22, 1995, Paul and an acquaintance, Trinity Ingle, followed Williams, an eighty-two-year-old man, from downtown Hot Springs, Arkansas, to a walking trail in Hot Springs National Park. Paul and Ingle robbed and beat Williams and then shot him in the head and shoulder. They attempted to hide the body by pulling it about thirty feet off the trail. Williams' body was found on June 26, 1995, by a hiker, who found it under logs and rocks, with hands and ankles tightly bound by duct tape. A piece of duct tape around Williams' neck was presumed to have once been around Williams' mouth. The Deputy Coroner testified that Williams' head was nearly detached from his spine and there was a large open wound at the right temple above the jaw. Further, a State of Arkansas medical examiner testified that the body had gunshot wounds to the head and chest. The medical examiner testified that Williams died as a result of the wound to the head.

FBI agents testified that Williams' wallet was later found in the park near his body. A few days later, Williams' vehicle was found 150 feet down in a pit in a remote area of the park. Trinity Ingle's latent fingerprint was recovered from inside of the vehicle.

Several of Paul's acquaintances testified that Paul confessed his involvement in the crime to them. Each of these witnesses gave similar accounts of what Paul had told them about the offense. Chris Rogers testified that Paul said that he and Ingle murdered an old man after following him into the park because he looked like an "easy target" to rob. Rogers testified that Paul stated when Williams resisted the robbery, they began beating him, including kicking him in the head hard enough to

knock his eye out of its socket. Paul also told Rogers that because Williams was not yet dead following the beating, he shot him, and then Ingle shot him. Paul and Ingle then dragged the body into the woods and covered it up, according to what Paul told Rogers.

Rogers testimony was corroborated by several other witnesses. Christine Lapaglia testified that Paul told her he had killed someone when he kicked him and broke his neck. Cindy Wallace testified that Paul told her he had a recurring dream about following an old man, taking his money, and beating him so severely his eye came out of the socket. Paul told Wallace the old man begged for his life, but fearing that he would talk, Paul shot him in the head. Dan Coughlin testified Paul said that he and another Arkansas man had robbed an old man for his vehicle, then shot and killed him. Paul's brother also testified that he saw Paul and Ingle driving a car which matched the description of Williams' car.

Paul left Arkansas shortly after the murder and evaded authorities for a little more than one year. He was arrested in August 1996, and confessed his involvement in the crime to FBI Agent John La Voie. Paul's statement to La Voie was consistent with the accounts given by Paul's acquaintances, except Paul told La Voie that only Ingle had shot Williams.

The jury found Paul guilty of both counts, and the same jury then proceeded to the penalty phase of the trial. At the penalty phase, the victim's two daughters and a co-worker gave victim-impact statements. Paul's mother testified about various aspects of Paul's unsettled childhood. Paul also offered a tape-recorded jailhouse

conversation in which Ingle implicated two people named "Bob" and "Andy"[1] in Williams' murder.

Following penalty-phase deliberations, the jury unanimously found that Paul was eighteen years or older at the time he committed the offense and that he intentionally aided and abetted in the killing. The jury also unanimously found several statutory and non-statutory aggravating factors.[2]

No jurors found any statutory mitigating factors. Some members of the jury found several non-statutory mitigating factors, which mostly related to Paul's upbringing and family life, and also took into account the fact that Paul was youthful at the time of the offense and had witnessed violent acts in the past. No jurors, however, found that Paul's participation in the offense was minor, that his prior history of criminal conduct was insignificant, that he committed the offense while experiencing emotional disturbance, that Ingle was equally culpable and did not receive the death penalty, or that Paul reversed parental roles with his mother. After

---

[1]Although it is not completely clear from the record, it would seem that both sides think that "Bob" and "Andy" were code names for either Jeffrey or Trinity or both.

[2]The jury found the following statutory aggravating factors: (1) the offenses were committed in an especially heinous, cruel, or depraved manner involving torture or serious physical abuse; (2) the offenses were committed in the expectation of receiving something of pecuniary value; and (3) that the victim was particularly vulnerable due to old age. The jury also specified the following non-statutory aggravating factors: (1) the defendant would be a continuing threat to society; (2) the defendant had attempted to commit another act of violence prior to this; (3) the defendant successfully eluded capture; (4) the defendant exhibited a lack of remorse; (5) the victim was killed to conceal evidence of the robbery; (6) the victim had personal characteristics as a human being; and (7) the family of the victim suffered injury and loss as a result of the victim's death.

balancing these aggravating and mitigating factors, the jury unanimously decided to impose a death sentence.

In this appeal, Paul raises several grounds for relief. Pursuant to the FDPA, this court "shall address all substantive and procedural issues raised on the appeal of a sentence of death." See 18 U.S.C. § 3595(c)(1). Further, the statute mandates that "[t]he court of appeals shall state in writing the reasons for its disposition of an appeal of a sentence of death under this section." See id. at § 3595(c)(3). Thus, we address each of Paul's contentions in some detail.

## II. DISCUSSION

### A. Jury's Finding on Intent

Paul argues that the jury was instructed improperly because it was not required to make the "requisite finding of intent" at the penalty phase of the trial. For Paul to be death penalty eligible under the FDPA, the government had to prove beyond a reasonable doubt that Paul either:

> (A) intentionally killed the victim; (B) intentionally inflicted serious bodily injury that resulted in the death of the victim; (C) intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim died as a direct result of the act; or (D) intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act . . . .

18 U.S.C. § 3591(a)(2).

At the penalty phase, the jury was instructed:

> Before you may consider the imposition of the death penalty, you must first unanimously find beyond a reasonable doubt that the defendant intentionally aided and abetted in the killing of Sherman Williams.

Paul asserts this instruction authorizes a death sentence on a finding of intent to aid and abet, and not intent to cause death. He argues the instruction does not satisfy any of the four intent requirements of the FDPA. In its brief, the government counters that Paul did not object to this instruction in the punishment phase on this basis, and thus plain error analysis applies. However, at oral argument, counsel for the government conceded that failure to utilize the language of the statute was plain error, but argued that it did not affect Paul's substantial rights. See United States v. Olano, 507 U.S. 725, 735 (1993) (three prongs to plain error analysis: there must be error, which is plain, *and* it must affect substantial rights).

The government argues that, considering the totality of the instructions given to the jury, together with the jury's actual finding in the guilt phase that Paul aided and abetted in the killing, the jury had to have found the requisite conduct and mental state necessary to satisfy any statutory or constitutional intent requirement. Specifically, the government argues that the definition of aiding and abetting in the guilt-phase instructions encompasses the language required by at least one of the four statutory factors in 18 U.S.C. § 3591(a)(2). The guilt-phase instructions were included with the penalty-phase instructions in the notebooks the jurors took into the jury room.[3] According to the government, when the instructions from each phase of

---

[3]Prior to penalty-phase deliberations, the jury was instructed:

> I will call to your mind the fact that we have this jury instruction booklet which you utilized in the first phase. There have been added to it certain things. Y'all notice at the front, the index has changed. The index now

the trial are read together, it is obvious that the jury was given sufficient instructions on the issue of intent to fulfill the requirements of section 3591(a)(2). Therefore, because the jury actually found in the guilt phase of the trial that Paul aided and abetted the killing, the government contends that Paul's substantial rights were not affected by any instructional error.

A conviction will not be reversed due to allegedly erroneous jury instructions unless, viewed in their entirety, the instructions fail to correctly state the law. See United States v. Webster, 162 F.3d 308, 322 (5th Cir. 1998). Further, jury instructions are evaluated in the context of the entire charge and a jury is presumed to follow all instructions. See Jones v. United States, 527 U.S. 373, 391 & 394 (1999).

The best way to comply with section 3591(a)(2) is to actually use the language of the statute in the jury instruction. Because the language of the statute was not used here, we must review the totality of the jury instructions to decide whether the jury made a finding of intent adequate to satisfy the requirements of section 3591(a)(2). In the guilt phase, the jurors were instructed that to aid and abet in the commission of a crime, the person must know the crime was being committed or going to be committed, and that the person knowingly acted to cause, encourage, or aid in the commission of the crime. The instructions further stated that merely being present is not enough, instead, the person must know the crime is occurring.

---

shows not only the 26 instructions that you had at the outset, but also Number 27 which is the Court's preliminary instruction that I gave you prior to this Phase 2. And there are also additional instructions, instruction numbered 29 through 44 inclusive, which will be your instructions in this Phase 2. I have put those instructions in the booklet and tabbed it with a yellow tab that says Phase 2, if that can be of any assistance to you in helping you locate where they begin.

We hold that the jury's penalty-phase findings together with its guilt-phase conclusions are sufficient to satisfy the requirements of the FDPA. The jury found that Paul intentionally committed an act (aided and abetted), which he knew would kill Sherman Williams. This finding clearly satisfies section 3591(a)(2) because it closely tracks the language of subsection (C) of section 3591(a)(2) requiring that Paul "intentionally participated in an act, contemplating that the life of [Sherman Williams] would be taken." 18 U.S.C. § 3591(a)(2)(C).

If anything, to *know* that a life will be taken requires greater awareness than merely *contemplating* that a life will be taken. The dictionary definition of "know" which most closely corresponds to this situation is "to perceive or understand as fact or truth; to apprehend clearly and with certainty." WEBSTER'S UNABRIDGED DICTIONARY 1064 (Random House 2d ed. 1997). The definition of "contemplate" most analogous to this situation is "to have in view as a future event." Id. at 438.

Under the aiding and abetting instruction at the guilt phase, the jury made a finding that Paul knew with certainty that his acts would take the life of Sherman Williams. The jury was then again instructed at the penalty phase that it must unanimously find that Paul intentionally aided and abetted in the killing of Sherman Williams. When the two instructions are viewed together, it is manifest that the jury was satisfactorily instructed on the intent requirements of the FDPA. Accordingly, we hold that Paul's substantial rights were not affected by the district court's failure

to use the express language of section 3591(a)(2).[4] <u>See, e.g.</u>, <u>Jones</u>, 527 U.S. at 394-95 (assuming the jury was erroneously instructed that the defendant would receive less than a life sentence if the jury could not unanimously agree on either a sentence of death or life in prison, this arguably "plain" error did not affect the defendant's substantial rights).

It is also clear that Williams died as a direct result of Paul's acts. The medical examiner testified the cause of Williams' death was a gunshot wound to the head. The evidence showed, as will be discussed in greater detail in the next section, that either Paul or Ingle, or both men shot Williams. Either way, the evidence established, and the jury agreed, Paul aided and abetted in the shooting of Williams. Because the gunshot wound was the cause of Williams' death and the jury found that Paul aided and abetted in that act, the requirement in section 3591(a)(2)(C) that "the victim died as a direct result of the act" is satisfied by the jury's findings.

---

[4]Paul also argues that the instructions did not comport with the constitutional requirements of <u>Enmund v. Florida</u>, 458 U.S. 782, 798-99 (1982), which requires specific intent to kill for imposition of the death penalty in a felony murder case. However, the constitutional intent requirement is satisfied when the defendant is a major participant in either the killing, or an underlying felony in the case of felony murder, and is recklessly indifferent to human life. <u>See</u> <u>Tison v. Arizona</u>, 481 U.S. 137, 158 (1987); <u>Roberts v. Bowersox</u>, 137 F.3d 1062, 1067 (8th Cir. 1998). Here, the evidence shows that Paul was a major participant in the killing of Sherman Williams and was recklessly indifferent to human life. Furthermore, the intent element can be satisfied in a later stage of trial, such as the sentencing phase, as here. <u>See</u> <u>Hopkins v. Reeves</u>, 524 U.S. 88, 100 (1998). Finally, this is an aiding and abetting case, not a felony murder case, and therefore distinguishable from <u>Enmund</u>. Thus, the constitutional claim is without merit.

## B.    Inconsistent Prosecutorial Arguments

Paul asserts that the prosecutor argued at both Paul and Ingle's trials that the defendant on trial pulled the trigger, and argues the prosecution cannot take such inconsistent actions.  Again, the government points out that there was no objection to this argument at trial and that review is for plain error.  This court has recently issued an opinion addressing a similar argument.  In Smith v. Groose, 205 F.3d 1045 (8th Cir. 2000), we granted habeas relief to a petitioner because the prosecutor had relied upon factually inconsistent theories to obtain murder convictions in separate trials for the same murder.  See id. at 1052-53.  In Smith, we held that Smith's trial was fundamentally unfair and he was deprived of due process because the state relied upon factually inconsistent and irreconcilable evidence at the two trials, and because Smith could not have been convicted of felony murder under both theories.  See id.

Here, the theory that either Paul or Ingle, or both, shot Williams, was not factually irreconcilable and was supported by the evidence.  Paul stated to both Chris Rogers and Cindy Wallace that he shot Williams.  In addition, Paul told Rogers that Ingle also shot Williams after Paul did.  The defense admitted the evidence was in conflict during closing argument at the guilt phase, stating: "I think throughout the testimony we heard three things; that Jeffrey shot Mr. Williams, that Trinity shot Mr. Williams, that Jeff and Trinity shot Mr. Williams.  It is never a consistent story as to who shot Mr. Williams."   More importantly, Paul could have been convicted of aiding and abetting in the murder of Sherman Williams under either theory.  See United States v. Clark, 980 F.2d 1143, 1146 (8th Cir. 1992) ("To convict under the aiding and abetting statute, 18 U.S.C. § 2, the government need only prove that [each] defendant associated himself with the unlawful venture, participated in it as something he wished to bring about, and by his action sought to make the activity succeed.").

Finally, Paul only argues that the prosecutor made inconsistent *arguments* at the two trials, but cannot point to the use of evidence at the different trials which was factually inconsistent and irreconcilable. At the guilt-phase closing argument in Paul's trial, the prosecutor also conceded there were three possible scenarios with regard to the shooting.[5] When it cannot be determined which of two defendants' guns caused a fatal wound and either defendant could have been convicted under either theory, the prosecution's argument at both trials that the defendant on trial pulled the trigger is not factually inconsistent. See Nichols v. Scott, 69 F.3d 1255, 1268-69 (5th Cir. 1995) (regarding the analogous felony murder situation). Thus, because there was evidence that supported both theories, and since Paul could have been convicted of aiding and abetting under either theory, we find no error.

## C.      Sentencing Phase Instructions for Mitigating Factors

Paul next asserts that a sentencing-phase instruction allowed only those jurors who found the existence of a mitigating factor to consider that factor, and that jurors who did not find that factor to be mitigating were precluded from considering it. The instruction states:

> All of you must weigh any aggravating factors that you unanimously found to exist, whether statutory or non-statutory, and each of you must weigh any mitigating factors that you individually find to exist.

Paul argues this language precluded Juror A from considering a mitigating factor found by Juror B, if Juror A had not also found that factor mitigating. Again, Paul did not object to the above instruction and thus our review is for plain error. At most, we find the instruction was ambiguous because it did not go on to state that Juror A *may* consider a mitigating factor found by Juror B even if not found by Juror

_____

[5]The prosecutor stated, "Then, depending on which version you believe, Jeff Paul either shot first, they both shot him, or Trint Ingle shot him."

-11-

A. See Jones, 527 U.S. at 377 (jury may consider a mitigating factor in its weighing process so long as one juror accepts the factor by a preponderance of the evidence). However, viewed in the context of all the instructions, we find the challenged instruction does not violate either the Constitution or the FDPA. See id. at 391 (instructions that may be ambiguous in the abstract cured when read in conjunction with other instructions).

The jury was instructed at the penalty phase that regardless of its findings on aggravating and mitigating factors, it was "never required to recommend a death sentence." Thus, even if Juror A felt somehow precluded from considering a mitigating factor found by Juror B, Juror A was also instructed that regardless of the outcome of the aggravating and mitigating balancing, there was never a requirement to recommend a death sentence. Again, because the jury is presumed to have followed all instructions, we find no error.

## D.    Co-defendant's Life Sentence as Mitigating

Paul next argues that his rights under the FDPA and the Constitution were violated because the jury failed to unanimously find and consider as a relevant mitigating factor that Ingle only received a life sentence.[6] He argues that under Lockett v. Ohio, 438 U.S. 586, 605 (1978) (requiring sentencer *be able* to give

_____

[6]We question whether we are able to review the jury's findings regarding the number of jurors who found a particular mitigator because the FDPA does not require the jury to return special findings showing which mitigating factors the jury found to exist or the number of jurors who found a particular mitigator. See United States v. Hall, 152 F.3d 381, 413 (5th Cir. 1998), abrogated on other grounds by United States v. Martinez-Salazar, 120 S. Ct. 774, 782 (2000) (which held, contrary to Hall, that Constitution not violated when defendant required to use peremptory challenge to remove jurors who should have been removed for cause if the jurors do not eventually sit on the jury). Because this argument is easily disposed of on its merits, we will address it.

independent mitigating weight to aspects of defendant's circumstances), and Eddings v. Oklahoma, 455 U.S. 104, 115 (1982) (relevant mitigating evidence must not be *excluded* from consideration), no rational trier of fact could have concluded that Paul was more culpable than Ingle, who received a life sentence. Neither the FDPA nor Lockett and Eddings require a capital jury to give mitigating effect or weight to any particular evidence. See Boyde v. California, 494 U.S. 370, 377 (1990) (holding that the Constitution requires that the jury be able to consider and give effect to all relevant mitigating evidence offered by the defendant). There is only a constitutional violation if there exists a reasonable likelihood that the jurors believed themselves precluded from considering relevant mitigating evidence. See id. at 386. Here, the jury was certainly allowed to consider Ingle's life sentence, because this evidence was introduced at the penalty phase of the trial. Further we find support for the finding that Paul was more culpable than Ingle, because there was evidence that Paul, and not Ingle, shot Williams. Although there was also evidence that Ingle shot Williams, the jury was not required to credit this evidence. Accordingly, we find no error.

**E.     Paul's Youth as Mitigating Factor**

Paul argues that the failure of six jury members to find his age as a mitigating factor was error because he was only eighteen when he committed the offense. While we again express doubt about the propriety of reviewing the jury's findings in this regard, we find no constitutional violation. The jury was certainly not precluded from considering Paul's youthful age as a mitigating factor. See Boyde, 494 U.S. at 386. During the penalty phase, Paul's birth certificate was offered into evidence. It established that Paul was only eighteen at the time of the murder. The FDPA prohibits administering the death penalty to a defendant younger than eighteen at the time the offense was committed. See 18 U.S.C. § 3591(a)(2). Thus, the statute has a built-in guarantee that a minor will not be given the death penalty. However, Paul has not cited authority for the proposition that a jury is somehow *required* to give

mitigating effect to any factor, let alone this one. Accordingly, we find no constitutional violation.

### F. Aggravating Factors Duplicative of the Offense

#### 1. Intent

Paul argues the district court erroneously instructed the jury that Paul's intent to kill Williams was a statutory aggravator to be weighed in the selection phase of the jury's sentencing determination.[7] Paul also argues that as an aggravating factor, the intent finding does not serve to narrow the class of people eligible for the death penalty.

The government concedes that this instruction erroneously labeled "intent" as an aggravating factor, but argues that the error was not repeated in the special verdict form wherein the mental state inquiry was separate from the aggravating and mitigating factors inquiry. After reviewing the special verdict form, we agree that the jury was not led to believe that intent was to be treated by the jury as a statutory aggravator. The special verdict form starts with roman numeral one, which is the jury's required finding that Paul was eighteen, and then numeral two, which contains the "REQUISITE MENTAL STATE" intent finding. Roman numeral three is labeled "STATUTORY AGGRAVATING FACTORS" and contains the three statutory

---

[7]The instruction states:

The process of weighing aggravating and mitigating factors against each other or weighing aggravating factors alone, if there are no mitigating factors, in order to determine the proper punishment is not a mechanical process. . . . In this regard, you may note that the statutory aggravating factor concerning the defendant's intent duplicates the intent element of the offense.

-14-

aggravating factors used in this case. This clear separation of the mental state from the aggravating factors did not lead the jury to believe that "intent" was a statutory aggravating factor. We therefore need not address Paul's argument that "intent" as a statutory aggravator did not adequately narrow the class of people eligible for the death penalty.

### 2. Pecuniary Gain

Paul also argues that because "pecuniary gain" was an element of the offense of robbery, and also was used as a statutory aggravating factor, the class of people eligible for the death penalty was not sufficiently narrowed. To withstand constitutional scrutiny, an aggravating factor which makes the defendant eligible for the death penalty must not apply to every defendant convicted of a murder, but instead only to a subclass of murder defendants, and it must not be unconstitutionally vague. See Tuilaepa v. California, 512 U.S. 967, 972 (1994).

There is a difference between the eligibility determination and the selection determination in death penalty cases. See Jones, 527 U.S. at 377. During the eligibility phase, the jury makes the requisite age and intent findings, and the government must prove "beyond a reasonable doubt *at least one* of the statutory aggravating factors set forth at § 3592." Id. (emphasis added). If the government meets this burden, the jury then moves on to the selection decision, and must "consider all of the aggravating and mitigating factors and determine whether the former outweigh the latter." Id.

Pecuniary gain was used as a statutory aggravating factor at the eligibility stage, in addition to being an element of the underlying offense. However, the jury found two other aggravators beyond a reasonable doubt, either of which would have

made Paul death eligible.[8]  Thus, any error in the use of "pecuniary gain" as a statutory aggravator was harmless.

### G.    Improper Aggravating Factors

Paul next argues that the statutory "heinous, cruel or depraved" and the "victim vulnerability" factors are vague, and that several non-statutory factors are also vague.[9] The "heinous, cruel and depraved" instruction was given with a limiting instruction extensively defining those three terms.  With such an extensive limiting instruction, we find that this statutory aggravating factor is constitutional.  See United States v. Hall, 152 F.3d 381, 414 (5th Cir. 1998), abrogated on other grounds by United States v. Martinez-Salazar, 120 S. Ct. 774, 782 (2000).  In fact, the instruction given by the district court in this regard was nearly identical to the instruction given in Hall.  We have considered Paul's remaining arguments regarding aggravating factors and find no unconstitutional vagueness.

Paul also alleges the "heinous, cruel and depraved" factor and the "vulnerability of the victim" factor are duplicative of one another because they allow a jury to find two separate factors from identical facts.  Each of these factors is directed to entirely distinct aspects or components of the offense, i.e. one factor addresses the quality of Paul's violence while the other factor speaks to the frailty of the victim, and therefore, we find the factors are not duplicative.  We find that the evidence of the beating, which includes the fact that Paul and Ingle followed

---

[8]The special verdict form instructed the jury that if it answered "YES" to one or more of the statutory aggravating factors, it could continue its deliberations in accordance with the instructions.  If it answered "NO" to all three, however, deliberations were to cease.

[9]Specifically, Paul argues that lack of remorse, success in eluding capture by the FBI, and the victim-impact factor are vague.

Williams as he set off into the park for a walk, and then beat him severely enough to almost knock his eye out of its socket, is sufficiently heinous, cruel and depraved, whatever the age of the victim. Because Williams was eighty-two years old and less physically able to resist his attackers, the jury could additionally find the vulnerability of the victim to be an aggravating factor separate from the heinous, cruel and depraved nature of the crime. Accordingly, we find no error.

### H.     Unadjudicated Offense Evidence

Paul next argues that the prosecution relied upon unadjudicated bad act evidence at trial and at sentencing, in violation of Paul's statutory and constitutional rights. This evidence involves statements by Paul about a possible liquor store robbery. Chris Rogers testified that Paul had given him a gun and talked about using it to rob a liquor store and kill the owners. The government did not produce any other evidence concerning this alleged plan. Paul argues the evidence was inadmissible under Rule 404(b).

Rule 404(b) of the Federal Rules of Evidence prohibits the admission of evidence of the defendant's prior bad acts if the evidence is offered to show that the accused acted in conformity with prior bad acts, but does permit the admission of bad acts if the evidence is offered for a purpose "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b). We employ a four-factor test for assessing the admissibility of Rule 404(b) evidence. Prior bad act evidence may be admitted if it is (1) relevant to a material issue, (2) proved by a preponderance of the evidence, (3) greater in probative value than prejudicial effect, and (4) similar in kind and close in time to the offense charged. See United States v. Molina, 172 F.3d 1048, 1054 (8th Cir. 1999). Further, "[a] district court has broad discretion when deciding whether to admit or exclude prior bad act evidence, and this court will disturb a district court's decision only if we find that the evidence has no bearing on the case." Id.

We find the district court did not abuse its discretion in allowing testimony about the plans to rob the liquor store because this evidence was relevant to establish that Paul had access to a gun, as the gun used in the murder was never found. This evidence was also relevant to show Paul's plan to perform a robbery only two weeks before the robbery and murder of Williams, and thus was similar in kind and close in time to the robbery and murder of Williams. Further, Rogers' testimony on this matter was sufficient to prove by a preponderance of the evidence there was a plan to rob a liquor store.

Paul also argues this evidence was improperly used as an aggravating factor, because the FDPA requires that an aggravator related to prior criminal activity be based upon a criminal conviction. However, we note that the jury did not find that the attempted liquor store robbery was an aggravating factor. Therefore, any error in using this evidence as an aggravating factor was harmless.

## I.     Emotional Victim Impact Evidence

Paul argues that the volume and emotional impact of the victim impact evidence offered at the sentencing phase violated his constitutional rights. The Eighth Amendment is not violated when the government uses victim impact evidence at the penalty phase because this evidence is relevant to the jury's decision about whether the death penalty should be imposed. See Payne v. Tennessee, 501 U.S. 808, 827 (1991). Such evidence may be challenged on due process grounds only if "evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair." Id. at 825. We find the evidence in this case was clearly admissible under Payne, 501 U.S. at 827, and note that Paul was also able to present extensive mitigating evidence through the testimony of his mother. Therefore, we find no constitutional error.

**J.      Guilt Phase Evidence about Victim's Habits and Family**

Paul next argues that the government presented unnecessary and prejudicial testimony during the guilt phase of the trial regarding the victim's personal life. Paul argues this evidence should have been excluded under Rule 403 of the Federal Rules of Evidence because its only purpose was to unfairly create sympathy for the elderly victim. Rule 403 provides "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." We have reviewed the record and find the district court did not commit plain error by admitting such evidence.

**K.      FDPA's Authorization for Non-statutory Aggravating Factors**

Paul argues that the FDPA allows the government to arbitrarily and creatively choose as many non-statutory aggravating factors as it wishes, in violation of the separation of powers doctrine. Paul argues the statute improperly delegates this inherently legislative authority to the executive branch. The only other circuit to consider this argument rejected it. See United States v. Jones, 132 F.3d 232, 239-40 (5th Cir. 1998), affirmed, 527 U.S. 373 (1999). The Fifth Circuit reasoned that the prosecution was adequately limited in its power to define non-statutory aggravators by the notice provisions in the FDPA, the Supreme Court death penalty jurisprudence, the district court functioning as a gatekeeper against impermissibly prejudicial information, and the FDPA's requirement that at least one statutory aggravating factor be found by the jury before it moves on to non-statutory factors. See id. Thus, the prosecution is sufficiently guided by "intelligible principles" to constitutionally exercise the delegated authority to define non-statutory aggravating factors. See id. at 240. We agree with the Fifth Circuit that the prosecutor's authority to define non-

statutory aggravating factors is a constitutional delegation of Congress' legislative power.

**L.    Prosecutor's Closing Argument**

Paul asserts error in several respects about prosecutorial closing argument at both phases of trial. Again, Paul did not object during arguments at trial, and thus the prosecutor's arguments are subject to review for plain error. We have reviewed the record and find no error in the closing arguments and certainly no error which affected Paul's substantial rights.

**M.    Voir Dire Errors**

Paul argues the district court should have allowed the defense individual and sequestered voir dire. He also argues the district court impermissibly shortened voir dire and made the process prejudicial to Paul and impaired his ability to exercise peremptory challenges. Paul made no objection during voir dire and we review for plain error. Voir dire in this case took approximately two days, and several jurors were questioned individually while sequestered from the rest of the venire. The district court has wide latitude over the conduction of voir dire and we review for an abuse of discretion only. See United States v. Granados, 117 F.3d 1089, 1092 (8th Cir. 1997). We find the district court did not abuse its discretion and conducted voir dire in a way that protected Paul's Sixth Amendment right to a fair trial. See id.

Paul also argues the district court improperly ruled on several challenges for cause, alleging that three jurors who were too pro-capital punishment were not dismissed, and that three jurors with anti-capital punishment views should not have been dismissed. With regard to the three jurors allegedly favoring capital punishment, the record shows that all three had indicated on the previously filled-out juror questionnaire that they did not believe a sentence of life without parole was a

-20-

sufficient penalty for an intentional killing. However, all three of these jurors were individually questioned by defense counsel and by the trial judge, and during questioning, at some point, each one said that he or she could fairly consider a sentence other than death for an intentional killing. A defendant subject to the death penalty may properly challenge for cause any juror "who will automatically vote for the death penalty in every case" and who will not consider aggravating and mitigating circumstances as required by the instructions. Morgan v. Illinois, 504 U.S. 719, 729 (1992). That is not the case here. Each juror expressed a good-faith ability to consider a sentence of life without parole if Paul were convicted of the underlying charges. Furthermore, none of the three jurors actually sat on the jury. A defendant's right to exercise peremptory challenges is not denied or impaired when the defendant chooses to remove jurors who arguably should have been removed for cause. See United States v. Martinez-Salazar, 120 S. Ct. 774, 782 (2000). Furthermore, the Sixth Amendment guarantee to a fair trial is not violated in this situation because those jurors did not end up sitting on the jury. See id. at 781-82.

Paul also asserts that three jurors should not have been removed for cause because of their views in opposition to the death penalty. All three jurors indicated an opposition to the death penalty in open court in response to initial questioning by the trial court. Upon reading the transcript of the first juror's individual questioning by defense counsel and by the trial court, we find that this juror could not set aside her views against capital punishment. She stated unequivocally several times that she could not impose the death penalty. Further, Paul voiced no objection when the court dismissed her for cause.

The second juror, in response to extensive questioning by both attorneys and the trial court, once stated that she could consider, with difficulty, the death penalty, but at the close of her individual questioning, she stated unequivocally that she could not impose the death penalty. This time, defense counsel even agreed this juror be dismissed for cause, stating to the judge, "[y]ou don't have any choice."

-21-

The third juror was also not willing to set aside her views against capital punishment and follow the law. The closest this juror came to saying that she could even consider the death penalty was to say that if someone were to kill one of her own children, she "may want to pull the switch" herself. However, this juror obviously was not sitting on a jury for the trial of her child's killer. She made it clear that in reality, she could not fairly consider the death penalty, despite instructions from the court. Again, defense counsel did not object when this juror was dismissed for cause.

Each of these three jurors indicated they could not fairly consider imposing the death penalty as a possible sentence, regardless of the instructions from the court. As such, the district court did not abuse its discretion by removing them for cause. See Morgan, 504 U.S. at 729.

## N.     Death Sentence Result of Passion and Arbitrariness

Paul's final argument is that the cumulative effect of the preceding alleged errors demonstrate that the verdict and death sentence reflect clear arbitrariness. Because we have dismissed all of Paul's allegations of error, we need not consider their cumulative effect. However, under the FDPA, we are *required* to "consider whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor." See 18 U.S.C. § 3595(c)(1). We find Paul's sentence in this case was not imposed under such arbitrary conditions. The jury found, beyond a reasonable doubt, the existence of several statutory and non-statutory aggravating factors, and also considered many mitigating factors. This is exactly the process the jury was to complete. In light of the substantial evidence supporting the aggravating factors found by the jury, we cannot say that the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor.

## III.  CONCLUSION

Accordingly, as we have reviewed[10] and rejected all substantive and procedural issues raised in Paul's appeal, we affirm the judgment and sentence of the district court.

HEANEY, Circuit Judge, dissenting.

I believe the jury's guilt-phase and penalty-phase findings are insufficient to overcome the district court's plainly erroneous instruction and satisfy the requirements of the federal death penalty statute.  Accordingly, I respectfully dissent.

The district court's guilt-phase instructions included the following instruction on aiding and abetting:

> A person may be found guilty of any crime even if he only aided and abetted the commission of that crime.  In order to have aided and

---

[10]Pending with our consideration of the merits of the case is a Motion to Correct the Record on Appeal, filed by appellant on April 23, 1999.  Appellant has argued that some transcripts of the numerous pretrial proceedings in this case were not provided to him on appeal, and that he could not effectively brief his case without these volumes.  The United States Attorney responded that some of the missing proceedings were ex parte communications between appellant's trial counsel and the trial judge.  Further, any other missing proceedings, according to the United States Attorney, were held in front of the magistrate judge, who has a different court reporter than the district court.  We note that our docket sheet reflects that five more volumes of transcripts were filed with this court following this motion.  We further note that our consideration of the issues raised in this appeal was not impeded by an incomplete record.  Because the record has been supplemented with these transcripts, and because appellant was able to provide the court with over 185 pages of briefing, we deny the motion.

abetted the commission of a crime, a person must before or at the time the crime was committed,

One: Have known the crime was being committed or was going to be committed, and

Two: Have knowingly <u>acted in some way for the purpose of causing, encouraging, or aiding</u> in the commission of the crime.

For you to find the defendant guilty of any crime by reason of aiding and abetting, the Government must prove beyond a reasonable doubt that all of the essential elements of the crime were committed by some person or persons and that the defendant aided and abetted the commission of the crime.

You should understand that merely being present at the scene of the event or merely acting in the same way as others or merely associating with others does not prove that a person has become an aider or abetter. A person who has no knowledge that a crime is being committed or about to be committed, but who happens to act in a way which advances some offense, does not merely become and aider and abetter.

(Tr. Vol. IV at 848-49 (emphasis added).)

The majority holds that the above definition of aiding and abetting, coupled with the jury's penalty-phase finding that Paul "intentionally aided and abetted in the killing of Sherman Williams," is sufficient to meet the standard set forth in § 3591(a)(2)(C). According to the majority, "the jury found that Paul intentionally committed an act (aided and abetted), which he knew would kill Sherman Williams." <u>Ante</u>, at 7. The majority's rendition of the jury's findings, however, is nowhere to be found in the instructions the jury received.

-24-

Stated precisely, using the language of the jury instruction itself, the jury found that Paul "knowingly acted in some way for the purpose of causing, encouraging, or aiding in the commission of the crime." It is this finding that must be squared against § 3591 if Paul's death sentence is to be upheld.

As the majority notes, § 3591(a)(2)(C) requires in part that the jury find Paul "intentionally participated in an act, contemplating that the life of a person would be taken." In addition to this mens rea standard, however, the statute requires a finding that "the victim died as a direct result of the [defendant's] act." The additional language is critical, because it requires a close causal nexus between the defendant's act and the victim's death. The majority apparently considers this portion of § 3591(a)(2)(C) to be superfluous. This nexus requirement was not addressed--explicitly or implicitly--by the court's jury instructions.

In particular, the nexus requirement is not satisfied by the guilt-phase instruction that the jury consider whether Paul "knowingly acted in some way for the purpose of causing, encouraging, or aiding" in Williams' murder. This is because aiding and abetting, as defined in the guilt-phase instruction encompasses several different degrees of connection between the defendant's acts and the victim's death. One who has caused, encouraged, or aided in a murder is not necessarily a direct cause of the victim's death.

Where a life hangs in the balance, this court should not permit a district court to improvise its own standard for imposing the death penalty. The ultimate punishment requires more than an instruction that "closely tracks" the standard set forth by Congress. Rather, that the jury must grapple with the propriety of the death penalty for Paul according to the precise criteria set forth in § 3591. Because that has not yet happened in this case, Paul is entitled to be resentenced. I respectfully dissent.

-25-

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.